In our second case today, we've got Family Health Physician Physical Medicine v. Pulse8. Mr. Herra, good to have you with us, sir. Thank you, Your Honor. It's nice to be here. May it please the Court. My name is Glenn Herra. I represent the appellant, Family Health Physical Medicine. The District Court in this case dismissed the complaint for failure to state a claim on the element of whether the facts at issue is an advertisement, as defined by the Telephone Consumer Protection Act. It held that, quote, where the commercial purpose does not appear on the face of the facts, close quote, the facts just can't be an advertisement unless it's within the four corners of the document. That holding is plainly inconsistent with this Court's ruling last September in Carlton and Herra's Chiropractic v. PDR Network. Can I see if you could skip? I was going to say why. Well, because in PDR Network, the commercial purpose of the facts was not evident within the four corners of the document. The facts in that case just offered a free publication, a free copy of the 2014 PDR e-book. But there was nothing within the four corners of the document that would indicate the commercial purpose. The Court looked beyond the four corners of the fact. It didn't put on evidentiary blinders and limit itself to that document. It thought about, well, what's the nature of PDR's business? What does it do? And one of the things it does is it distributes copies of the PDR, and it's compensated for doing that by the pharmaceutical company. So I definitely agree PDR helps you with that. I just want to narrow and see. As I understood it, you originally basically had four theories. You concede that PDR just takes the first one out, the first theory, which is that the mere fact that it contains an offer of a free good or service. PDR just says that is not sufficient. That's correct, Your Honor. And then your last one is about the chance to win the gift card. I guess I wouldn't say that PDR destroys that one, but I would say PDR is not helpful for that one. Would you agree with that? I agree. It doesn't expressly address that argument. I agree. But it's definitely not helpful, and that's not our primary argument. Okay. Our primary argument are two points. One, the commercial nexus that the court held is required in the latest PDR Network case. It's more strongly present here than it was in PDR Network. In PDR Network, PDR doesn't sell anything to the recipients of the faxes. PDR gets compensated by the pharmaceutical companies whose drugs are listed within the physician's desk records. It does not sell anything to the fax recipients. This case is totally different because Pulse 8 sells, as alleged in the complaint, it sells its coding technology to the fax recipients. And the free webinar that the fax recipients are invited to attend is about medical coding. It's about coding for behavioral health disorders. So, the defendant has a product to sell to the fax recipients. Now, that product's not advertised in the fax, but there's a commercial nexus there for sure. So, they're trying to make an analogy to that. If you said in the PDR case, yes, send me this electronic encyclopedia, then PDR makes money off of that. But if you say in this case, okay, I'll go to the webinar, there's no direct commercial profit at that point. We haven't alleged that Pulse 8 gets paid or makes money. The webinar's free. We admit that. They're not charging people to attend the webinar. It seems like that's a distinction. I mean, it may not be decided, but the mere fact of acceptance of the offer in the PDR case meant the offeror made money on it. But just because somebody says, okay, I'll go to the webinar, the folks in Pulse 8 isn't making money off of that at that point. They never. Yeah, not directly. Well, they're not making money off of it indirectly. There's a lot more that's got to happen. Well, we don't know yet. This case is like the Behringer case, the Physicians Health Service versus Behringer, the Second Circuit case, which this court cited with approval in all of it, at least in the first and second PDR opinions. In that case, the fax advertised a free seminar regarding a medical condition, and it was sent by a pharmaceutical company, and that pharmaceutical company had a drug in the pipeline. It hadn't gotten FDA approval yet, but it had a drug in the pipeline to treat that particular medical disorder. So the fax didn't say, you know, we have this drug that's going to treat this medical disorder. It just was on the face of the fax. It was purely educational about the medical disorder that the drug company had a drug in the pipeline to treat. And the Second Circuit said, well, let's use our common sense here. There's a business purpose for what they're doing here, and there's a commercial nexus between the subject of the seminar and the product that the defendant has to sell. It was enough at the pleading stage to get them passed a motion to dismiss. Now, the plaintiffs ultimately lost that case. It was my case at summary judgment. We got discovery. We got the slides that they presented at the free seminar. We got testimony from the people who planned it and, like, e-mails between them and such, and ultimately they convinced the district court that there wasn't a commercial purpose. Are you making a pretext argument at this point? Excuse me? Are you making a pretext argument? Thank you. Yes, that is the second point. So we have the first one. There's a commercial nexus. The second point is the pretext argument, and this is a really strong pretext case because in order to accept the offer, in order to accept the invitation to attend the webinar, and the complaint clearly alleges this, recipients, tax recipients, were required to agree to the privacy policy on Pulse 8's website. And that privacy policy says that by accepting the offer, we may also use your personal data to deliver information to you that, in some cases, is targeted to your interests, new services, and promotion. So as I understand that, in response to this first fax, I sign up for the free seminar, and that's, in their view, okay because that is not actually advertising me anything. But in the course of signing up for their free seminar, I've now consented to them sending me faxes that are unquestionably advertisements, and then they'll be able to defend on the ground that I said it's fine. Is that correct? Of course. You've given your prior express invitation or permission by agreeing to their privacy policy, right? So it's a pretext. What about this language in this last PDR case? However annoying the hypothesized future faxes may be, that is they cannot convert a prior and unrelated free offer into certain commercial under the pretext of it. Right. And that's because it didn't hinge on acceptance of the free offer in the PDR network. Whether you accepted the free copy of the PDR e-book or you declined the free copy of the PDR e-book, it made no difference. You were going to continue receiving faxes about health care services from the PDR network unless you opted out. The language in PDR was in the opt-out notice. This is an express hook that if you want to accept this free thing, you have to agree to receive future promotions from us. And that's what makes it different. And that's what makes it fall within the pretext theory that PDR network 6 approved. Approved? Suggested that we probably would approve. I think you're over-reading it when you claim that it adopted the pretext theory. I read it as saying, there's some good arguments, but we don't need to decide that because even if a pretext theory was valid, it fails here. I think it was stronger than that. I see exactly what you're saying, Your Honor. But what the court said was we have no reason to doubt it. And other circuits have adopted it. And then it's cited. And other circuits have been very skeptical. Right. And PDR network 6 cited the mile of the case from the Third Circuit, MAUTHE, I believe. In the parenthesis it says, leaving the question open. Right? So it said the Third Circuit left the question open. I don't think this court did leave it open. I think it approved it. We have no reason to doubt is a very weird way of saying we adopted. I think approved. Citing with approval, right? Okay. But I agree it didn't hold the facts in that case. I guess I'll say, if we were to reject it, I don't believe we would be violating the rule of absolute inter-panel stare decisis. Do you think that we would be violating this court's absolute inter-panel stare decisis if we said no? I don't think so, Your Honor, because it didn't actually apply it to the facts of the case. But I think it's something stronger than a mere observation. You know, the defendant says the facts in this case is like a fax promoting a Fourth of July parade. Right? Let's say a car dealership sent a fax promoting the Fourth of July parade, and it sponsors a float at the Fourth of July parade that obviously, you know, advertises the car dealership. And I thought that was interesting. But the better analogy, really, is if the car dealer sent a fax inviting you to their new dealership, right? Just to look around. It doesn't mention any cars. It doesn't say anything about pricing or MSRP or financing options or anything like that. Just come in and see our new fancy dealership that we just built. Have some free pizza, whatever. They're trying to get you in the store, right? And that's what we allege, and it's the reasonable inference to which the plaintiff is entitled at the pleading stage, that Pulsate is sending this fax to get you into the dealership, to get you into the webinar, to show you it's coding technology. It's got a product expressly designed to help fax recipients do this coding. So what if the volunteer fire department sends out faxes and they say, We invite you to our open house. And they're also going to have a bazaar there, and they sell things, and that's how they finance the tax-exempt volunteer fire department. So does that come under the Act? No, I don't think so. Because it's not a business. They're making money. But it's not a business. That's a nonprofit. And the Second Circuit made that distinction in Behringer, and this court observed that in the first PDR decision, that there is a distinction to be made there. But, again, the similarity to Behringer, it's the most similar circuit court case I can point the court to, Physicians Households v. Behringer, because this is a stronger case, really, than PDR Network, and it's more like Behringer, because that commercial nexus is so clear. In PDR, PDR doesn't sell things to fax recipients. Its clients are the pharmaceutical companies who list their drugs in the PDR. Here, PulseAid sells products, coding technology, to fax recipients, and it's inviting them to a webinar about medical coding. I'm not sure that's your strongest argument. We talked about this earlier, because in the PDR, when you accept this free offer, then they're making money right at that point, but they're not making money right at that point in this case. But it is the same as Behringer, and that really is the only other circuit court dealing with a free seminar fax. PDR Network is a free publication fax. And, you know, they're similar, but it's a different nuance. And, you know, the defendant argued below, and it argued before PDR Network came out. This is an unusual case, because the district court decided this case without the benefit of PDR Network VI. We briefed the case before this court without the benefit of that. It's like it kind of reset the whole thing. And really the only briefs that are important there are the supplemental five-page briefs that both parties filed after. They're really just arguing about what PDR says. Yeah, it is. But anyway, in the big picture, yeah, we argued below this bright-line rule that if something makes known, if a fax makes known, that's how we interpret it in advertising, if it makes known the quality of a service or good, then it's in advertising, right? Really broad, we had a good basis to argue it because it's a remedial statute, and we thought it should be interpreted as broadly as possible. But that was our bright-line rule. It would sweep in a lot. There wouldn't be many things that wouldn't be in advertisement, I admit. But that was rejected, right? And the defendants had their bright-line argument. They want to rule that the fax on this four corners has to offer to sell you something, right? It has to be an explicit sales pitch to be an offer. And this court in PDR Network 6 rejected both of our approaches, and it went straight down the middle, and it said we're not going to be at either extreme. We're going to say there has to be a commercial nexus, and we're not going to limit ourselves to the face of the fax. We're going to use common sense. We're going to consider what the defendant's business is. We're going to consider, in some other case, whether there's a pretext to further advertising in the future. My time is just about up. You've got 20 seconds. So we're asking the court to reverse the dismissal. And if there's no further questions, I'll reserve the remainder of my time. Thank you. Thank you very much, sir. Ms. Upshaw? Good morning, and may it please the court. Amy Upshaw on behalf of the 8th Appellees. As I see things here, I think there are three areas where we disagree. One is on the test of what it means to be commercial. Two is on what the allegations say. And then three, on what circuit precedent or precedent exists that's most on point. So maybe I'll start with the first test on what it means to be an unsolicited advertisement. As we read this court's decision in PER, there are sort of two questions that the court needs to ask. One, does the fax offer a service, good, or product? And two, is there a direct mechanism by which the sender profits if that offer is accepted? Here, all that is offered on the face of the fax is a webinar. If that webinar is accepted, if people go to the webinar, if they sign up for it, there is no allegation that pulsates profits in any way. And so that makes it very different than the PDR case where the court said, you know, in that situation. So is your argument there that the complaint is deficient? There's no allegation of this next level of profit? I'm trying to understand whether this is an evidentiary argument or you're saying the complaint is deficient on its face. I think the complaint is deficient on its face. There's nothing in the complaint. The plaintiff has never made the argument that by accepting the webinar, pulsate makes any money. I think that my friend acknowledges that it's totally free. There's no sense that this is part of my client's business is to get people into the doors of the webinar and someone else pays them for putting on these continuing education courses. So did you argue in the district court that the complaint was deficient on its face? Yes. The court dismissed the complaint for failure to state a claim. And so that's the position that we've taken this entire time is the complaint, even accepting all of the allegations that's said, it doesn't state a claim upon which relief can be granted. Can I give you a hypo that I think illustrates some of my concerns about the tests that you're urging and your sort of maximalist view of what the Seventh Circuit held? Okay. So I want you to imagine a fax that has an image of like a highway going off into the middle distance, right? And it says, come take a test drive today. And then it says, Upshaw Motors. And that is the entire content of the fax. There is nothing else on the fax. I guess I will say it seems self-evidently obvious to me that that is an unsolicited advertisement. And it seems to me that under your test, that would not be an unsolicited advertisement. Respectfully, I disagree. I think when you go to that first question, does this fax sort of offer a good product or service? I think an objective person reading that would understand that Upshaw Motors is trying to sell you a car. And so they might be saying something like, come take a test drive or come visit our dealership. But sort of the obvious inference from that is Upshaw Motors is selling cars. They want you to come experience the cars. And if you buy the car, they're going to profit from it. But that seems like an important first-order concession, which I think has probably got to be right, which is that the ad doesn't actually have to say cars for sale. It doesn't have to say starting at $19,000. That there are certain circumstances where a normal reader of the English language and from context can tell, this is indeed offering to sell me something. That's exactly right. And we 100% agree that the court can consider what an objective reader is going to understand when they see something and it doesn't need to say car for sale, $20,000. Advertisements are clever. It can use all sorts of humor or indirect ways to make sales. But here, I don't think that there is any allegation that someone would look at this fax and say, we'll say it's selling their coding technology. Really? Because I don't know. I mean, I guess my reaction is when I look at this fax, I think, oh, they absolutely want to sell me their coding technology. Come learn about coding technology, which, by the way, we will then sell you how to do. I think there are maybe three reasons why that can't be true. One, there's nothing on the fax that says that Pulsate even sells coding technology. I think you'd have to be pretty in the weeds. There's nothing in the fax. I didn't hear part of what you said. There's nothing in the fax that says Pulsate sells coding technology. It's not, you know, Pulsate, a coding technology company, welcomes you to such and such webinar. Two, if you look at the fax. So if their company was called Pulsate Coding, you think we might have a different answer? If the name of the company, which was on the fax, was Pulsate Coding? I think when you're asking what a reader would understand the sender to be selling, it could make a difference if you're Upshaw Motors versus, you know, Upshaw Nonprofit when it asks you to come take a test drive. The second thing that I think is important is that if you look at the fax, on the upper right-hand corner, you'll see AAPC, CEU approved. The AAPC is the largest professional organization of medical coders in the country, and that CEU approved stands for Continuing Education Unit Approved. So someone who knows the industry will look at this and know this is a continuing education course that medical coders need to take to maintain their good standing with this professional organization. So I don't think anyone would think, oh, this is a one-hour infomercial for Pulsate Services. So let me give you another hypo that might take us all back to law school. When all of us, and many of us in this room were in law school, and got invited to come learn how to use Westlaw, was that an advertisement? Because I remember getting all kinds of things in law school saying, come on down, we'll have candy, we'll teach you how to use Westlaw. Was that an advertisement for Westlaw? So I would go back to my test and say, one, is there a good offer of service that's being promoted? And I think, yeah, the service is Westlaw. But I'm not going to that because I need to do some Westlaw research. I'm going because they're going to teach me how to use Westlaw. But I think that everyone would understand that what they're promoting is Westlaw as a service. They want you to learn how to use Westlaw, and then you go to, are they going to make money? Well, the students don't have to pay anything, but if you look at how Westlaw makes money, they make money by people getting on there and running searches. The drug dealer strategy. They get you in with free stuff, they hook you, and then they start charging you later? I think it's very similar to the PDR strategy. And then, sorry, one last thing aside from the continuing education course that I think is important to point out is that Pulsate doesn't actually sell this coding technology to doctor's offices. This technology is sold to health plan payers. This is part of that visualization and risk plan. So if you look at the paragraph 14 of the complaint where it sort of copy-pastes what Pulsate's website says, it says this is a visualization and risk platform that risk-bearing entities need. Yeah, but okay, counter-argument. Westlaw doesn't actually sell Westlaw to law students. Westlaw sells Westlaw to law firms and government agencies, but by hooking the law students, they then create a world in which the future employees of these places will pressure them. Right? I have never once personally paid for a Westlaw search in my entire life in law school or since. My employer has paid for my Westlaw searches. I think that's right. So that gets back. If you accept what is being offered, you accept the Westlaw service, there's a direct mechanism by which Westlaw profits, and the students don't have to pay for that. That follows into the PDR world. Here we have this webinar. If you go to the webinar, Pulsate doesn't make any money. And then if you get to this pretext theory where they say, oh, but you'll be drawn into the webinar, and then there will be advertisements later down the road that's going to influence you to buy this technology, that doesn't make any sense either because doctor's offices just aren't the clients for this. And as I said, this is a continuing education course. I mean, to the extent the court does want to adopt the pretext theory, and I don't think it does, but it doesn't need to reach that in this case, I do think the word pretext has to do a lot of work. Kind of the overarching purpose needs to be this, you know, advertising banning people later. It can't be the case that you have a continuing education course with some sort of remote advertising link, and somehow that's enough to call it a pretext. What about, can I ask you about the seven, something I, so I'm reading the seven circuits opinion, and they seem like they're adopting a very firm rule, and then I get to this language. Indicates directly or indirectly to a reasonable observer. And then I was like, well, depending on what indirectly means, like right there, I mean, I think maybe your example with the car indicates there has to be some indirect. But I was like, I mean, I don't know how indirect is indirect because I guess, could you give me an example of something that you think meets the seventh circuits indirect test? Like I'm trying to figure out what's at stake in rejecting the pretext theory versus simply having a common sense understanding of what indirect is. Could you give me an example of something that is not, or something that is indirect that would not also be pretext or, you know what I'm saying? I'm trying to understand the delta between what an indirect advertisement and the pretext theory is. Keeping in mind they didn't give any examples. They just said it, which seems inconsistent with the rest of their opinion, but that's what it says. So I think this court and PR recognize that there are sort of two different flavors of this pretext theory. And I want to kind of pull those apart because the first one is, I think, what the seventh circuit is alluding to and what your hypothetical was getting at. If you look at the facts, you know, it doesn't say coffee, $1.99. There's something that's indirect that talks about how Dunkin' Donuts, America runs on Dunkin' Donuts. There's something that maybe a reasonable observer looking at it would know, oh, this is an advertisement for donuts or coffee, but doesn't directly say it. I was also thinking of like the early like silhouette ads for the iPod that don't ever actually say iPod on them. They're just like a person in silhouette with dangling white headphones. Yeah, I think those are all good examples where someone looking at it, you know, there's not something that you can point to that says XYZ widget or XYZ price. But looking at it, you understand the indirect message is that the iPod is for sale or that a car is for sale. And so there is a product or service that's being promoted within the ad itself. So that's the first pretext theory. And the second is this pretext to future advertising theory. I think that's very different. So before you leave that, tell us why the facts here doesn't have an indirect aspect to it. Pulsate's not a charity, so it's not offering this educational benefit out of an ileomycinary purpose. So what would be the difference between this and the example you just gave? So I think the question is what is the product or service being promoted in the facts? I think whether directly or indirectly, the only thing that's being promoted within the facts is this webinar. I do think that, you know, businesses do think about their bottom line, but it also is not uncommon for businesses to give back to their professional communities, especially in this way of holding continuing education courses. I mean, in the legal profession, we do this all the time. We take on pro bono cases. We, you know, moot Supreme Court cases. Businesses don't run a charity, though. That's right. And so I think we do all of this stuff because it is generally good for branding and for goodwill, but the court in PDR said that that alone is not enough to get to that commercial nexus. End of the day, the TCPA asks whether you're sending unsolicited advertisement to a fax machine. And here, we just don't have an advertisement that is commercial in nature that has been sent to a fax machine. There is an invitation to a free webinar, a continuing education webinar. You can go. You cannot go. That doesn't make any impact on Full State's bottom line. Can I ask you about Bollinger? Is there a way for us to rule for you without necessarily saying Bollinger is wrong? I think that this court doesn't need to reach the pretext of future advertising theory. This court said that Beringers were the prototypical pretext of future advertising theory. Unlike the allegations that this court pointed to, here there is no allegation that there's actually a promotion that's going on at the webinar, that this is an hour-long infomercial, that there's any advertisement at all. The district court pointed that out. There's no facts to that effect. But doesn't Beringer say, like, that's a little screwy because that would suggest they have to go to your webinar to find out whether you're, like, that they have to suffer a further indignity of going to your webinar and finding out what you're doing for your webinar before they can sue you for your unsolicited fax for the webinar. I mean, one thing PDR says that really strikes me is, like, this is just the motion to dismiss, and it is entirely possible that once we get into discovery and evidentiary that the plaintiffs lose, that all we're talking about now is a motion to dismiss. And I think Beringer is the one that says this, like, the plaintiff doesn't have to go to the very unsolicited webinar in order to discover the facts necessary to state a 12b-6 for an improper fax. What's your response to that? So I think the fact that there is no allegation, even on information or belief, that there was going to be an advertisement at the webinar is telling. And I also think it's important that the district court dismissed without prejudice, pointed that out, and plaintiffs didn't add any allegations to that effect. I also think this is different from Beringer in that, you know, looking at a webinar is very different than having to actually go to a dinner and sit through it and see what happens there. And certainly, like, plaintiffs could have looked and seen what's going to happen if they signed up and seen if there was any advertisement that was going to happen in the future. I think the fact that we sort of don't know whether there was going to be an advertisement at some point in the future maybe illustrates the point that no advertisement has been sent to a fax machine. Well, what about your friend's second argument, which is, so as a condition of going to this webinar, I have consented to you sending me an unlimited number of unquestionable advertisements for the future? So if you look at what plaintiffs said, it says to sign up for this webinar, you have to go to the Zoom link. You type in your information to register for the Zoom link, and there's a kind of boilerplate language that says we're going to send your information to the account holder. And it's going to be held in accordance with the privacy policy. So then you go over to Pulse's privacy policy, and this is all the information that it has, and it says we might use this for different purposes, including for information, and sometimes that information might be a promotion. So that's so attenuated. Really? It doesn't seem that attenuated to me. It seems like every single website I ever click on where I've just consented to them doing all sorts of things in perpetuity. So I think, again, when you get back to the pretext, the question that you're asking is, like, what is the overarching motive or purpose behind this webinar? And to say that, well, the overarching purpose was actually to get these medical coders' e-mails to be able to send a promotion in the future when Pulse 8 doesn't even sell products to medical coders or doctors' offices in the first place. It sells these products to risk-bearing entities and health plan entities. I think that would draw it way too far. If you look at the Third Circuit. If they sold directly to medical coders, would that make a difference? I think that would maybe shrink how closely the allegations were. It would get closer, maybe, to the pretext. I still think you would need to show that the overarching purpose or the very reason for the facts for the webinar was just to get information. I think the fact that you have an hour-long continuing education course that's been approved by a professional organization all shows that that's a whole lot of trouble to go through if all you're trying to get is, you know, a couple of e-mails to send information to in the end. Lastly, I do want to be very clear. The Beringer is not the case that's most on point. I'm sorry, I couldn't hear you. What case is not the most on point? The Beringer case is not the most on point. There are two decisions, one from the Seventh Circuit, one from the Third Circuit. They were both decided last year. That's the Ambassador Animal Hospital case, and then the Third Circuit's Millennium Health case. Both of those cases involved faxes, inviting people to participate in educational seminars. In both instances, the courts there said this is not an unsolicited advertisement within the meaning of the TCPA. If anything, the faxes in those cases were sort of more closely connected than here. In the Seventh Circuit, there were allegations that there was going to be promotion at the dinner seminar, and the Seventh Circuit said that's not enough. In the Third Circuit, you had a medical monitoring company that invited people to learn about the opioid crisis and how medical monitoring can be a tool that businesses use to protect against that. And both the Seventh Circuit and the Third Circuit said that's not enough. You need to have the faxes. The fax needs to offer the product, good, or service that's being sold, and something that's attenuated would not suffice. If there are no further questions, we do think that this court has set forth a good test, and that that test should apply here. And under that test, the only thing that was promoted in the fax was a free continuing education webinar, and that Pulsate would not stand to profit if that offer were accepted. If there are no further questions, we would ask that the court affirm the district court's decision. Thank you very much. Mr. Perra? Thank you. I have to clarify one thing up front. The Beringer decision, Physicians Health Service versus Beringer, is from the Second Circuit. I may have said Seventh Circuit before, but it's a Second Circuit decision. Let me ask you about a point they make in the Seventh Circuit decision, Ambassador Animal Hospital. And they note that the provision that you're suing under and that most of these cases come under doesn't have language in it that describes the sender's motivation, what's their intent. But there are other sections of the act that do, and they draw a distinction on that basis. What's your response to that? I'd say that this is a remedial statute, and it's supposed to be broadly construed in favor of consumers and against fax advertisers. That's what this court held. Because normally we'd say, you know, if Congress has put particular language in one part of the statute but left it out of the other part, that that makes a substantive difference. That can in some circumstances, but if it's ambiguous or something, but I don't think that applies here at all. And I think it's contrary to PDR Network. I mean, PDR Network 6 from last September from this court says you look beyond the face of the fax and you consider the sender's business motivation. You consider what kind of the nature of its business. Why is it doing this? What's the connection? Is there a commercial nexus there? And as the Second Circuit pointed out in Behringer, I can't know all those things because you can't. I don't know what happened at the webinar. And by the way, this is important. In Behringer, my friend said that the plaintiff there alleged that the defendant's products were marketed at the free seminar. That is not true. I looked at the complaint in that case yesterday. It was my case. There's nothing about what actually transpired at the seminar. And there's a good reason for that because I don't know what happened there. I can't allege what was done or what wasn't done there. But the Second Circuit held from the facts that you've alleged, that defendant is this kind of business, that the defendant is having a seminar on this subject. There's a connection there. And the reasonable inference is that the defendant promoted its products at the seminar. That turned out to not be the case, by the way, in that case. But it was a reasonable inference at the pleading stage. It wasn't pled in the complaint. It was an inference. You don't plead inferences. Inferences are drawn from facts. You allege facts and the court draws inferences from them. So we argued it in that case that you should infer that the defendant promoted its goods at the seminar. But we did not allege it. And I can show that to the court if you'd like me to. I can file the complaint with a letter. I don't know if that's a Rule 28J letter or what, but I'd be more than happy to do it. My friend said that if you look at the facts in this case, you wouldn't know that Pulsate sells coding technology. And I agree. That's true. That's why we alleged it. That's why I did some legwork. And I looked up, when I got this fax from my client, I said, who's Pulsate? What do they sell? And I saw that they sell coding technology, and they're advertising a free webinar about medical coding. And so I said, well, there's a commercial nexus there. And I alleged it in the complaint. What kind of business are they? So, you know, the idea that it has to be, you have to make that commercial nexus just from what you can learn from this piece of paper. It's too narrow and wooden and strict. And more important, it's contrary to PDR Network 6. And it just, there's no way to square those. You have to look past the facts. And it's sticking just to the face of the facts would be inconsistent with the remedial purpose of the Telephone Consumer Protection Act. It would favor junk fax advertisers, and it's just not a good rule. And once you get rid of that rule, the district court's dismissal in this case can't stand. It has to be reversed. Thank you, Your Honors. Thank you very much, Mr. Harrah. We appreciate the arguments of counsel. And your case will be submitted. We'll come down and greet counsel and then take a short break. This honorable court will take a brief recess.
judges: Robert B. King, G. Steven Agee, Toby J. Heytens